# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>BLACKBOARD INSURANCE SPECIALTY COMPANY, ET AL.,<br><br>Defendants. | CASE NO. 18-cv-04410-YGR<br><br>**ORDER GRANTING MOTION OF MESA AND NDO GROUP FOR PARTIAL SUMMARY JUDGMENT AND DENYING CROSS-MOTION OF BLACKBOARD FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 49, 51 |

The Court herein considers two pending motions: one joint motion for partial summary judgment brought by plaintiff Mesa Underwriters Specialty Insurance Company ("Mesa") and nominal defendants NDO Group, LLC, Danny Haber, Alon Gutman, and Dion Ross (collectively "NDO Group"), and the other, a motion for summary judgment by defendant Blackboard Insurance Specialty Company ("Blackboard")[1]. Both motions concern Blackboard's alleged duty to defend NDO Group against the claims asserted in an underlying action filed in the Superior Court of the State of California, County of Alameda, Action No. RG16-822634, entitled *Knapp, et al., v. Haber, et al.* The Court heard oral argument on the cross-motions on May 28, 2019.

Having duly considered the parties' written and oral arguments, and the admissible evidence submitted, and for the reasons set forth herein, the Court **ORDERS** as follows: Mesa Underwriters' motion for partial summary judgment on the issue of Blackboard's duty to defend is **GRANTED** and Blackboard's cross-motion for summary judgment is **DENIED**. The allegations of the complaint in the underlying action included claims as to which Blackboard owed a duty to defend NDO Group under Coverage A (bodily injury and property damage) and Coverage B (personal and advertising injury).

---

[1] Defendant Blackboard Insurance Specialty Company was formerly known as Hamilton Specialty Insurance Company. (*See, e.g.*, Opposition, Dkt. No. 51, 2:4-6.)

## I. SUMMARY OF FACTS[2]

### A. The Underlying Action

On April 1, 2016, NDO acquired a "single room occupancy," long-term residential hotel located at 392 11th Street, Oakland, California ("Hotel"), in which a number of low-income tenants were residing. NDO group began renovations on common areas and some units in the Hotel shortly thereafter. While NDO negotiated buyouts with 20-25 tenants, several tenants continued to reside in the Hotel under the terms of their leases.

On July 8, 2016, some tenants of the Hotel filed a complaint in Alameda County Superior Court, *Knapp, et al. v. Haber, et al.*, Case No. RG16822634, alleging eight causes of action: (1) violation of the Oakland Tenant Protection Ordinance; (2) breach of covenant of quiet use and enjoyment; (3) breach of implied warranty of habitability; (4) intentional infliction of emotional distress; (5) nuisance; (6) negligence; (7) wrongful eviction; and (8) elder abuse. (Jones Decl. Exh 1, "Tenants' Complaint.") The tenants alleged in pertinent part:

> Since the Defendants purchased the Property . . . they have engaged in a pattern or practice to create, or have by their actions and/or omissions allowed to exist, conditions, conduct and a climate at the Property which have and continued to adversely affect Plaintiffs, in violation of Oakland's Tenant Protection Ordinance (Oakland Municipal Code§§ 8.22.600, et seq.) TPO and other state and local laws.

(*Id.* ¶ 16(h).) The tenants amended their complaint on July 21, 2016, to add a claim for violation of the Fair Employment and Housing Act. (Jones Decl. Exh. 2, "Tenants' FAC".) The tenants alleged that, among other things, the following:

NDO Group directed ongoing construction and renovation activities that disrupted the quiet enjoyment of the plaintiffs' homes and resulted in the constructive and wrongful evictions of tenants. (*Id.* at ¶ 16.) The tenants were no longer being supplied heat, garbage pickup, or secure mail delivery. (*Id.* ¶ 16 (k), (m), (n).) The apartments all around them were gutted to the studs, large holes were created in the ceilings of apartments (including apartment of a tenant-plaintiff), and construction debris was dumped down the holes. (*Id.* at 7-8.) Some of the tenants were

---

[2] All facts are undisputed unless otherwise noted.

2

forced to vacate their units due to water leaks, failure to repair habitability defects, ongoing wrongful entries to their apartments, noise, dust, and a continuing nuisance resulting from the construction activities. (*Id*. at ¶ 16.)

The tenants filed a Second Amended Complaint on May 1, 2017, alleging ongoing construction activities that disrupted the tenants' quiet enjoyment and the habitability of their apartments. (Jones Decl. Exh. 4, "Tenants' SAC".) The SAC added allegations that: defendants demolished communal bathrooms in the Hotel; defendants created holes in the walls of the apartments, including a tenant-plaintiff's room; and one tenant plaintiff (Howe) fell and injured his knee on or about November 2, 2016, in an unlit stairwell and eventually was forced to vacate his unit on January 29, 2017, due to the dangerous living conditions. (*Id.* at 9-10.) The SAC further alleged that one of the remaining tenant-plaintiffs (Chavez) endured "gaping holes in the walls allowing the cold air to penetrate his unit and preventing him protection from the elements while being unable to plug in his wall heater because Defendants construction efforts cut-off the electricity. . . . personal belongings [being] ruined due to water leaks in his closet . . . [, and] days when the water supply was completely cut off." (*Id.* at 11.)

The tenants filed a Third Amended Complaint on May 22, 2018. (Jones Decl. Exh. 11, "Tenants' TAC".) As to remaining tenant-plaintiff Prather, the TAC added new allegations that he had lost use of a toilet, sink, and shower due to lack of sufficient water pressure; and that he was coerced to vacate his room temporarily for repairs only to find upon his return that his belongings had been thrown out. (*Id.* at 11.) As to tenant-plaintiff Chavez, the TAC alleged that he had been forced to vacate his unit as of July 25, 2017, after having been physically assaulted at the hands of one of the construction workers who had blocked his entry and shouted "this is a construction zone! No one lives here." (*Id.* at 11-12.) In the July 12, 2017 assault, the TAC alleges that the construction worker choked Chavez, pushed him against a wall, forced him down a stairwell and shoved him to the ground. (*Id.* at 12.) Chavez sustained injuries and was taken away in an ambulance for treatment. (*Id.* at 12.) The TAC alleged that a member of the NDO Group (Ross) was seen talking with the construction worker who assaulted Chavez before the police arrived on the scene. (*Id.* at 12.) Chavez never returned to sleep at the Hotel thereafter. (*Id.* at 12-13.)

**B. The Policy**

On November 18, 2016, a few months after NDO Group had begun its ongoing work on the Hotel Traveler, NDO Group purchased a commercial general liability insurance policy from Blackboard. (Jones Decl. Exh. 3.) One year later NDO Group purchased a renewal policy from Blackboard. (Jones Decl. Exh. 5.) The Blackboard policies share the same coverage form (CG 00 00 04 13), which contains two basic coverages—Coverage A, liability for bodily injury and property damage, and Coverage B, liability for personal and advertising injury. The relevant Coverages sections of the policies state as follows:

COVERAGE A: BODILY INJURY AND PROPERTY DAMAGE LIABILITY

    1. Insuring Agreement

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

    * * *

    b. This insurance applies to "bodily injury" or "property damage" only if:

    (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    (2) The "bodily injury" or "property damage" occurs during the policy period; and

    (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II-Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

    * * *
    2. Exclusions

    This insurance does not apply to:

    a. Expected Or Intended Injury

    "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury"

4

resulting from the use of reasonable force to protect persons or property.

COVERAGE B: PERSONAL AND ADVERTISING INJURY LIABILITY

    1. Insuring Agreement

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.…
\* \* \*
    2. Exclusions

    This insurance does not apply to:

    a. Knowing Violation Of Rights Of Another
"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

(Jones Decl. Exh 2, 3.) The Policy defined key terms as follows:

    2. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
\* \* \*
    13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

    14. "Personal and advertising injury" means injury including consequential "bodily injury" arising out of one or more of the following offenses:
\* \* \*
    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

\* \* \*
    17. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of such physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(*Id.*)

**B.    Defense of the Underlying Action**

The tenants filed their initial complaint in the Underlying Action on July 8, 2016 and filed a first amended complaint shortly thereafter on July 21, 2016. Mesa accepted the defense of NDO Group in the Underlying Action in October 2016.

On February 8, 2018, Blackboard received notice of the Underlying Action. (Jones Decl.

Exh 8.) Mesa tendered the defense of NDO Group to Blackboard on February 26, 2018. Having received no response to the tender letter, Mesa again contacted Blackboard on April 12, 2018, and detailed the basis for its assertion that Blackboard had a duty to defend NDO Group for some or all of the period starting from the date of purchase of the CGL policy. Blackboard denied tender. Despite Mesa's requests that Blackboard reconsider, both before and after the filing of a Second and a Third Amended Complaint in the Underlying Action, Blackboard denied having a duty to defend.

## II.   APPLICABLE STANDARDS

### A.   Summary Judgment

The parties each have filed motions for summary judgment on the issue of whether Blackboard had a duty to defend the NDO Group in the Underlying Action. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (alteration and internal quotation marks omitted). Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id*. (quoting Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2720, at 335–36 (3d ed. 1998)). If, however, the cross-motions are before the court at the same time, the court must consider the evidence proffered by both sets of motions before ruling on either one. *Riverside Two*, 249 F.3d at 1135–36.

### B.   Duty to Defend

An "insurer has a duty to defend an insured if it becomes aware of, or if [a] third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 19 (1995), *as modified on denial of reh'g* (Oct. 26,

1995) (internal citations omitted). Under well-established California law, "the duty to defend is broader than the duty to indemnify." *Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 299–300 (1993) (*Montrose I*); *see also Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal.4th 277, 287 (2014) (duty to defend interpreted broadly). It need not be shown that coverage is likely or even "reasonably" likely. *Montrose I*, 6 Cal.4th at 299-300. "If any facts stated in or fairly inferable from the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises." *Albert v. Truck Ins. Exch.*, 23 Cal.App.5th 367, 377–78 (2018) *quoting McMillin Management Services, L.P. v. Financial Pacific Ins. Co.*,17 Cal.App.5th 187, 191 (2017).

"Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor." *Montrose I*, 6 Cal.4th at 299–300; *see also Hartford Casualty v. Swift*, 59 Cal.4th at 287 (same). The insured need only show a mere possibility of coverage under the policy to establish a duty to defend, while an insurer is entitled to summary judgment only upon a showing that no potential for coverage exists under the policy as a matter of law. *Regional Steel Corp. v. Liberty Surplus Ins. Corp.*, 226 Cal.App.4th 1377, 1389 (2014); *see also County of San Diego v. Ace Property & Casualty Ins. Co.*, 37 Cal.4th 406, 414 (2005) ("*Ace Property*"); *Montrose I,* 6 Cal.4th at 300; *Gray v. Zurich Ins. Co.* 65 Cal.2d 263, 275 (1966). In other words, if the third-party complaint could not raise a single issue that would bring it within the policy's coverage under any conceivable theory, the insurer need not defend. *Gray*, 65 Cal.2d at 276, fn. 15; *see also Hyundai Motor Am. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 600 F.3d 1092, 1097 (9th Cir. 2010) (obligation to defend excused only when the complaint does not raise, by any conceivable theory, a single issue which could bring it within the policy coverage).

"The duty to defend is determined by reference to the policy, the complaint, and *all* facts known to the insurer from any source." *Montrose I*, 6 Cal.4th at 300 (emphasis in original). "The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Id*. "Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." *Id.* at 295, *quoting Gray*, 65 Cal.2d at 276.

If even a single claim in a multiple-claim complaint is potentially covered, the insurer has a duty to defend the entire action. *Buss v. Sup.Ct. (Transamerica Ins. Co.,* 16 Cal.4th 35, 48-49 (1997) (insurer has a "duty to defend the entire 'mixed' action prophylactically, as an obligation imposed by law in support of [public] policy. . . . it must defend entirely. It cannot parse the claims, dividing those that are at least potentially covered from those that are not."); *accord Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal.4th 988, 992 (2015). Moreover, "[a]n insurer that has issued an insurance policy that includes a duty to defend must defend any legal action brought against an insured that is based in whole or in part on any allegations that, if proved, would be covered by the policy, without regard to the merits of those allegations." RESTATEMENT OF THE LAW OF LIABILITY INSURANCE § 13 (June 2019 Update). "For the purpose of determining whether an insurer must defend, the legal action is deemed to be based on: (a) Any allegation contained in the complaint or comparable document stating the legal action; and (b) Any additional allegation known to the insurer, not contained in the complaint or comparable document stating the legal action, that a reasonable insurer would regard as an actual or potential basis for all or part of the action." *Id.*

"An insurer may rely on an exclusion to deny coverage only if it provides conclusive evidence demonstrating that the exclusion applies." *Atlantic Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1038-1039 (2002). However, in determining whether a particular policy provides a potential for coverage, the Court is guided by the principle that interpretation of an insurance policy is a question of law. *Ace Property*, 37 Cal.4th at 414 (citing cases). "If coverage depends on an unresolved dispute over a factual question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend." *Mirpad, LLC v. Cal. Ins. Guarantee Ass'n,* 132 Cal.App.4th 1058, 1068 (2005). Similarly, it is well-settled that an insurer must provide a defense "where an exclusion arguably applies but may reasonably be interpreted to be inapplicable to the alleged facts." *Aroa Marketing, Inc. v. Hartford Ins. Co. of Midwest,* 198 Cal.App.4th 781, 786 (2011).

//
//

8

## III. DISCUSSION

Mesa contends that Blackboard owed a duty to defend in light of a potential liability covered by either Coverage A or Coverage B of the Blackboard Policy. Blackboard counters that it owed no duty to defend because the Underlying Action alleged no "accident" but rather a conscious, preconceived course of conduct by NDO Group to drive the tenants out of the Hotel so that it could be renovated and rooms rented at market value rates, all of which predated the inception of the Blackboard policy.

### A. Coverage A

Mesa first argues that Blackboard was required to defend NDO Group under Coverage A because the Underlying Action alleged "property damage" and "bodily injuries" caused by an "occurrence" within the policy period. Blackboard disagrees arguing that there was no "occurrence" within the policy period because the events alleged were (1) intentional and (2) a continuous pattern of conduct alleged to have begun prior to the coverage period; and (3) the policy exclusion for intentional conduct applies. The Court addresses each argument in turn.

#### 1. Potentially Covered "Occurrence"

Blackboard contends that the allegations of the Underlying Action do not describe an "occurrence" because an occurrence can only be an "accident" and the conduct alleged is all part of an intentional scheme by NDO Group to force out the tenants. While Blackboard characterizes the "gist" or "theme" of the underlying litigation to be an intentional course of conduct undertaken to get the tenants out of the building, the tenants' complaints all allege that the NDO Group "engaged in a pattern or practice to create[ ] or *have by their actions and/or omissions allowed to exist*" conditions that gave rise to property damage and physical injury. (Tenants' FAC ¶ 16(h); Tenants' SAC ¶ 14(f); Tenants' TAC ¶ 15(f).) The latter language encompasses unintentional, negligent conduct. Indeed, the tenants included in their complaints a negligence claim based upon failure to maintain the property, failure to repair habitability defects, and creating a nuisance. (*See* Tenants' FAC ¶¶ 41-46; Tenants' SAC ¶¶ 39-44; Tenants' TAC ¶¶ 40-45.) The tenants in the Underlying Action based their claims on factual allegations that the NDO Group took actions injurious to their health and offensive to their senses, interfered with their comfortable enjoyment

9

of their personal property, and caused damage to that property by such allowing water leaks, removal of property by construction workers, and dust and debris intrusion. Further, the tenants in the Underlying Action alleged that the NDO Group hired and supervised construction workers who generated noise and dust, improperly entered units, and physically attacked a tenant, giving rise to NDO Group's potential liability for negligent hiring and supervision of those workers.

Even if some of the allegations in a complaint concern intentional conduct, so long as there are also factual allegations that could give rise to negligence liability, the insurer has a duty to defend. *Fed. Ins. Co. v. Steadfast Ins. Co.*, 209 Cal.App.4th 668, 680–81 (2012) (insurer contended claims excluded from coverage because they involved willful and intentional acts, but complaint "included allegations that the [defendants] could be found liable on a theory of vicarious liability as well as for their own acts," resulting in a duty to defend); *see also Albert v. Mid-Century Ins. Co.*, 236 Cal.App.4th 1281, 1291–92 (2015) (coverage not always precluded when some portion of conduct is intentional since an accident may exist when any portion of the causal series of events leading to the injury or damage was unintended); *Davidson v. Welch,* 270 Cal.App.2d 220, 234 (1969) ("[i]f the broad charge made, which claims an intentional or willful tortious act, contains within it the potentiality of a judgment based upon nonintentional conduct, the indemnitor becomes liable to defend.").[3] Here, the allegations of the Underlying Action included claims for bodily injury and property damage.

Blackboard's reliance on *Delgado v. Interinsurance Exch. of Auto. Club of S. California*, 47 Cal.4th 302 (2009) does not persuade. That action considered whether an alleged assault *by the insured* could be considered an "accident" under the terms of a homeowner's insurance policy and give rise to a potential for coverage. The complaint alleged that the insured physically struck,

---

[3] As recently explained by the California Supreme Court, "the term 'accident' is more comprehensive than the term 'negligence' and thus includes negligence. Accordingly, a policy providing a defense and indemnification for bodily injury caused by an accident promise[s] coverage for liability resulting from the insured's negligent acts." *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co., Inc*., 5 Cal.5th 216, 221-22 (2018). Moreover, injury-causing conduct of a third party "may be deemed an unexpected consequence of [the insured's] independently tortious acts of negligence." *Id*. at 229; *see also Allstate Ins. Co. v. Overton,* 160 Cal.App.3d 843, 851 (1984) (the fact an intentional tort is alleged, *e.g.* "assault and battery," does not eliminate insurer's duty to defend because judgment ultimately recovered may be on a negligence theory).

battered, and kicked the plaintiff in the underlying action and "negligently and unreasonably" believed he was engaged in self-defense. *Id*. at 306. The California Supreme Court concluded that these allegations against the insured himself all arose from the insured's intentional acts. Here, the party alleged to have assaulted tenant-plaintiff Chavez is not the insured, but a contractor or employee of the insured as to which the insured NDO Group was alleged to have vicarious liability for his conduct. Further, other allegations in the Underlying Action encompassed negligent conduct by NDO Group or its agents in carrying out the renovation of the Hotel.

In sum, at least one of the claims here, and the facts alleged, could give rise to liability of a type that would be covered by Coverage A of the Blackboard Policy. The Underlying Action alleged "actions or omissions" by NDO Group which "allow[ed] conditions to exist" which resulted in injury. While NDO Group might ultimately have been liable for intentionally causing some of the injuries alleged, much of the conduct in the Underlying Action is not alleged to have been undertaken with the knowledge that it would cause all the injuries alleged. Indeed, the negligence and breach of implied covenant claims in the Underlying Action would require no showing of intent at all. Thus, the Underlying Action alleged a potential for a covered occurrence.

*2. Within the Policy Period*

Next, with respect to whether triggering events were alleged within the coverage period, Mesa contends that while the original complaint in the Underlying Action preceded the inception of the Blackboard policy, additional injuries were alleged to have occurred during Blackboard's coverage period. Blackboard counters that the alleged injuries were all part of a course of conduct that began prior to the inception of their policy, and therefore had no potential for coverage.

The Blackboard Policy Coverage A applies to "'bodily injury' or 'property damage' [that] occurs during the policy period." (Jones Exh. 3 at MSJ00073 ¶ 1(b)(2).) An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id*. at MSJ00087, ¶ 13.) Further, "property damage" is defined as physical injury to or loss of use of tangible property and "loss of use" is deemed to have occurred at the time of the physical injury that caused it. (*Id*. at ¶ 17.)

First, the allegations of the Tenants' SAC and Tenants' TAC stated additional physical

11

injuries and property damage occurring after the inception of the Blackboard policy on November 18, 2016. Though prior complaints alleged that construction and resulting damage was ongoing, the additional conduct alleged is distinct and falls within the policy period which triggers a potential for liability under Coverage A. Moreover, Blackboard had a duty to undertake further investigation if the face of the complaints raised a question as to whether the ongoing construction activities caused new injury or property damage during the policy period. *See Eigner v. Worthington*, 57 Cal.App.4th 188, 198 (1997) ("State Farm assumed the risk of refusing to defend based solely on a review of the complaint which, on its face, should have alerted a reasonable insurer of the need to further investigate.")

Second, under a CGL policy like the one at issue here, where the "policy language unambiguously distinguishes between the causative event—an accident or 'continuous and repeated exposure to conditions'—and the resulting 'bodily injury or property damage' [, i]t is the latter injury or damage that must 'occur' during the policy period." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 669 (1995), *as modified on denial of reh'g* (Aug. 31, 1995) (*Montrose II*). Absent a contrary policy limitation, "bodily injury and property damage that is continuous or progressively deteriorating throughout successive CGL policy periods, is potentially covered by all policies in effect during those periods." *Id.* at 673. The timing of the accident causing the bodily injury or property damage, or the date of discovery of the damage or injury, are immaterial. *Id.* at 669, 675. Thus, even if the bodily injury or property damage alleged in the Underlying Action were considered to be part of a "continuous" pattern of conditions, Blackboard still had a potential for coverage giving rise to a duty to defend.

### 3. Known-Injury Exclusion

Finally, Blackboard relies on the policy language excluding bodily injury and property damage where the insured "knew that the 'bodily injury' or 'property damage' had occurred, in whole or in part" including any "continuation, change or resumption of such 'bodily injury' or 'property damage' . . . ." (Jones Decl. Exh. 3 at MSJ 00073, ¶ 1(b)(3).) Mesa argues each discrete injury claimed must be evaluated separately for this purpose. For the reasons set forth below, the Court agrees.

12

Interpreting identical CGL policy language, the Ninth Circuit held that "the known-loss provision bars coverage of 'property damage' if the insured "knew that *the* . . . 'property damage' had occurred . . . [and thus the u]se of the definite article 'particularizes the subject which it precedes' and indicates that the claimed damage must be the same as the known damage." *Kaady v. Mid-Continent Cas. Co.*, 790 F.3d 995, 998 (9th Cir. 2015) *citing Gale v. First Franklin Loan Servs.,* 701 F.3d 1240, 1246 (9th Cir. 2012). "[A]n insured's knowledge of one type of damage to property doesn't automatically constitute knowledge of any and all damage to the property; the claimed damage must be related to the known damage." *Id.* at 998-99. Similarly, in under California law, knowledge of one type of property damage does not constitute knowledge or other, distinct kinds of injury or damage. *Chu v. Canadian Indem. Co.*, 224 Cal.App.3d 86, 97–98 (1990), *modified* (Oct. 5, 1990). In *Chu*, a construction defect case, the Court of Appeal overturned a trial court's determination that the injury was "faulty construction" and additional defects nothing more than a "reoccurrence or further manifestation of the same defect of "faulty construction," holding that "each set of distinct defects must be analyzed separately to determine whether Chu had knowledge of those defects at the time . . . ." *Id.* at 98.

Here, while NDO Group may have been aware of some of the bodily injuries and property damage alleged before Blackboard's coverage began on November 18, 2016, many of the alleged injuries and property damage occurred after the policy's inception, including loss of electricity, bathroom facilities, damage to property due to water leaks in unit's closet, a slip-and-fall injury to one tenant navigating an unlit stairwell, and a physical attack on another tenant by a construction worker on the Hotel project. These allegations raised a potential for coverage of new, distinct injuries and property damage not alleged to have been known to NDO Group prior to Blackboard's policy period.

**B.     Coverage B**

Blackboard further contends there was no duty to defend arising from Coverage B because the Underlying Action alleged knowing violations (wrongful eviction, wrongful entry, and invasion of private occupancy) done by NDO Group with the intent to violate the tenants' rights. Coverage B provides that Blackboard will pay for damages "because of 'personal and advertising

13

injury'" and "will have the right and duty to defend the insured against any 'suit' seeking those damages." (Jones Decl. Exh 3 at MSJ00078, ¶ 1(a).) The Blackboard Policy defines "personal and advertising injury" as "injury including consequential "bodily injury" arising out of . . . wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor." (*Id.* MSJ00087 ¶ 14(c).) The Blackboard Policy excludes "personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury'." (*Id.* at MSJ00078, ¶ 2(a).)

Blackboard does not dispute that the Underlying Action alleges conduct that would constitute wrongful eviction, wrongful entry, or invasion of the tenants' right to occupy their units.[4] (*See* Blackboard Responsive Sep. Stmt., Dkt. No. 52, at ¶¶ 14, 17-22.) Instead, Blackboard relies on the "knowing violation" exclusion as the basis for its refusal to defend under Coverage B.

"[An] insurer that wishes to rely on an exclusion has the burden of proving, through conclusive evidence, that the exclusion applies in all possible worlds." *J. Lamb*, *supra*, 100 Cal.App.4th at 1038-39. While "it may ultimately be determined that [an insurer] has a viable defense to coverage by virtue of the application of [an] exclusion, this can only affect its liability for indemnification," not its duty to defend, because the "duty to defend depended on the existence of only a potential for coverage." *Id.* at 1040. Under the standard described in *J. Lamb*, such "potential cannot be 'conclusively negated' by pointing to disputed allegations in the very complaint that [insureds] are seeking to defend against." *KM Strategic Mgmt., LLC v. Am. Cas. Co. of Reading, PA*, 156 F.Supp.3d 1154, 1170 (C.D. Cal. 2015) (emphasis added). Courts will generally find a duty to defend regardless of the exclusion for knowing conduct since "'[t]here is

---

[4] "Wrongful entry" under Coverage B includes trespass and nuisance claims even where those claims do not involve an intent to dispossess the occupant. *See Martin Marietta Corp. v. Ins. Co. of North America* 40 Cal.App.4th 1113, 1125 (1995). Invasion of right of private occupancy covers actions for nuisance or other torts based on interference with another's use, enjoyment, or occupancy of real property other than "wrongful entry" or "wrongful eviction." *Waranch v. Gulf Ins. Co.,* 218 Cal.App.3d 356, 361 (1990); *Fibreboard Corp. v. Hartford Acc. & Indem. Co.,* 16 Cal.App.4th 492, 513 (1993); *Acc. Ins. Co. v. West American Ins. Co.* 42 Cal.App.4th 95, 103-104 (1996) (noninvasive nuisance claims covered under invasion of right of private occupancy).

14

usually at least a possibility of coverage . . . [;] despite the allegations of intentional acts, the insured's conduct may be shown to have been merely reckless or negligent.'" *Id.* (quoting J. Croskey, et al., CAL. PRAC. GUIDE: INS. LIT. ¶ 7:1066.2 (Rutter 2014)). The allegations in *KM Strategic* were that KM and its managers allegedly published knowingly false statements about the financial distress of a competitor in order to recruit physicians to contract with it. Despite these allegations of intentional conduct, the district court in *KM Strategic* concluded that "neither the 'knowing violation' nor the 'knowledge of falsehood' exclusions excused [the insurer's] denial of its duty to defend." *Id.* at 1171.

Here, the tenants in the Underlying Action need not prove knowing violations or conduct to establish liability on their claims. The allegations that NDO Group's "first order of business" was to coerce the tenants to move are coupled with other allegations of acts and omissions which allowed conditions and conduct to occur that resulted in property damage and bodily injury. (*Compare* Tenants' TAC ¶¶ 15(f) *with* 16(bb).) While Blackboard seizes on the notion that there was a coordinated "scheme" and "campaign" to drive the tenants out by causing the injuries alleged, the complaints in the Underlying Action are bereft of any allegations of such a scheme, just as Blackboard's briefs are bereft of citations to any portions of the complaints so alleging. Moreover, a plan to coerce tenants to move out does not necessarily encompass constructive evictions occasioned, in part, by the alleged injuries here (falling down an unlit staircase, being attacked by a construction worker). As such, under *J. Lamb*, the knowing-violation exclusion could not eliminate Blackboard's duty to defend under Coverage B.

Blackboard's reliance on cases dealing with intentional discrimination or sexual misconduct are distinguishable. For example, in *Coit Drapery*, the court held: "We emphasize that we are dealing here with a case in which the acts of sexual harassment alleged are, by their very nature, intentional and wrongful; it would be contrary to public policy to allow a wrongdoer which is directly and strictly liable for such wrongdoing, such as Coit, to shift the loss resulting from such an unlawful corporate practice to its insurer." *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.*, 14 Cal.App.4th 1595, 1606–07 (1993). Similarly, in *Northland Insurance*, "all of the alleged physical injuries arose from the alleged sexual misconduct of the insured," bringing the

15

allegations squarely within the policy's sexual misconduct exclusion and "the insured failed to show the possibility of extrinsic evidence that would show a potential for coverage under the policy," leading the court to conclude "there was no duty to defend the claims made in the underlying action." *Northland Insurance Co. v. Briones*, 81 Cal.App.4th 796 (2000).

Here, many of the claims in the Underlying Action concern conduct not inherently intentional like discrimination or harassment, but habitability issues that could arise from negligent or intentional conduct. And while the Underlying Action alleges "defendants" took various steps, the allegations largely concern actions taken by third parties or other individuals, as to which the insured would only be liable under a negligence theory, such as the failure to supervise. Thus, the potential for coverage here stands in sharp contrast to the cited authorities.

In sum, Blackboard has failed to meet its burden to provide conclusive evidence that the knowing violation exclusion would have precluded any chance of coverage for the various claims in the Underlying Action.

## IV. CONCLUSION

At least one of the claims here, and the facts alleged, would give rise to liability of a type covered by Coverage B and/or Coverage A of the Blackboard Policy. Thus, Blackboard had a duty to defend its insured NDO Group. Mesa and NDO Group's motion for partial summary judgment is **GRANTED** and Blackboard's motion for summary judgment is **DENIED**.

By no later than July 26, 2019, the parties shall submit a joint statement regarding their proposals as to how to proceed on the issue of the relief to which Mesa is entitled on the complaint.

This terminates Docket Nos. 49, 51.

**IT IS SO ORDERED.**

Dated: July 15, 2019

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE